NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 220283-U

NO. 4-22-0283

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 31, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| DEVIN NORMAN BOOSE, | ) | No. 15CF363 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Brendan A. Maher, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Turner and Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed an order granting the State's motion to dismiss defendant's second amended postconviction petition where defendant failed to make a substantial showing of ineffective assistance of trial counsel.

¶ 2     Defendant, Devin Norman Boose, appeals an order dismissing his second amended postconviction petition at the second stage of proceedings. He argues that he made a substantial showing of ineffective assistance of counsel for failure to call certain witnesses at trial. We affirm.

¶ 3                                        I. BACKGROUND

¶ 4     Following a bench trial in 2015, defendant was convicted of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2014)) and possession of cannabis with intent to deliver (720 ILCS 550/5(d) (West 2014)). The trial court sentenced defendant to 13 years in prison for being an armed habitual criminal, which was to run concurrently with an 8-year

sentence for the drug charge. On direct appeal, the Second District of the Illinois Appellate Court held, *inter alia*, that the evidence was sufficient to sustain defendant's conviction of being an armed habitual criminal under a theory that he constructively possessed a shotgun. *People v. Boose*, 2018 IL App (2d) 151052-U, ¶¶ 11-18. Defendant subsequently filed a *pro se* postconviction petition and an amended petition. The trial court was unable to complete its review of the amended petition within the time allowed for summary dismissal, so the court advanced the matter for second-stage proceedings. Appointed counsel then filed a second amended petition on defendant's behalf. The court granted the State's motion to dismiss that petition, and defendant challenges that order in this appeal.

¶ 5        To provide context for defendant's postconviction claim, we will first summarize the trial evidence.

¶ 6                                A. Trial Evidence

¶ 7        On February 13, 2015, Rockford police officers executed a warrant to search the premises at 1004 North Winnebago Street for narcotics. Officer William Donato knocked on the front door of the residence at that address and yelled " 'police, search warrant,' " several times. When nobody answered after about 20 to 30 seconds, the officers entered the premises by force. There were numerous people inside the residence, including defendant and his brother, Thomas Boose. At some point, Thomas was permitted to leave the house after telling officers that he did not reside there.

¶ 8        Officers encountered defendant in the hallway outside an upstairs bedroom at the southwest part of the house. Donato read a copy of the search warrant to defendant and his mother, Rosie Boose. Defendant and his mother told Donato that they owned the house. According to Donato, defendant "told us it was unnecessary to tear up his house, and that we

were just going to find weed" in his bedroom. The police indeed found cannabis and a digital scale in an upstairs bedroom at the southwest part of the house. The police also found a sawed-off shotgun in an upstairs bedroom at the northeast part of the house. The shotgun was located between the mattress and the box spring of a bed. Officers found shotgun ammunition in the basement.

¶ 9 Donato testified that, after the police found the shotgun, defendant said the shotgun was Thomas's and that the officers should not have allowed Thomas to leave. According to Donato, defendant stated that he had already told Donato not to let Thomas leave. Donato testified that defendant had not told him that. Later, an officer contacted Thomas and told him to return to 1004 North Winnebago Street.

¶ 10 Thomas testified for the State under a grant of immunity. He testified that, on the date of the search, he lived at 2208 Wallace Street with his girlfriend. When she evicted him, he would stay at 1004 North Winnebago Street. On the date of the search, Thomas was visiting 1004 North Winnebago Street, as he often did. The police allowed Thomas to leave the premises, but he was later called back to the residence. When he returned, Thomas told the police that the shotgun belonged to defendant and was given to defendant by someone known as "S.B."

¶ 11 On the evening of the search, Thomas gave a written statement to the police, indicating as follows. About two months earlier, as Thomas was leaving the house at 1004 North Winnebago Street, he saw defendant talking outside with S.B. S.B. gave defendant a shotgun. Thomas heard defendant say that he did not have use for the shotgun. S.B. told defendant to just take it. Defendant put the shotgun inside his left pant leg and walked back into the house.

¶ 12 Thomas testified at trial that his statements to the police were untrue and that the shotgun actually belonged to him. Thomas testified that he was intoxicated when he made the

statements. (A police officer testified that Thomas did not appear intoxicated and that Thomas expressly denied drinking alcohol before giving his statements.) According to Thomas's trial testimony, S.B. gave Thomas the shotgun when defendant was not present. Thomas testified that he had children and did not want to keep the shotgun at his own home. Thus, he decided the best place to hide it was at his mother's house. Thomas likewise claimed ownership of the ammunition the police found at 1004 North Winnebago Street. On cross-examination, Thomas acknowledged that he had served a prison sentence for murder. The trial court ruled that Thomas's written statement, which was inconsistent with his trial testimony, was admissible as substantive evidence.

¶ 13    Following his arrest, defendant spoke with the police. When asked if the shotgun was his, defendant denied any knowledge of it. Defendant also told the police that Thomas had been sleeping in the living room of the Winnebago Street home for about a week. However, when informed of Thomas's statements, defendant claimed that S.B. had given the shotgun to Thomas at 1004 North Winnebago Street and that Thomas walked into the house with it.

¶ 14    The State introduced evidence that defendant had prior drug-related felony convictions in 2002 and 2008.

¶ 15    Tamesa Holmes testified for the defense. She had two prior felony convictions. Holmes testified that defendant was her fiancé, and they had one child together. On February 13, 2015, Holmes lived at 1004 North Winnebago Street with her children, defendant, Rosie, and Thomas. Thomas lived there "off and on," and he had stayed there for a couple weeks leading up to February 13, 2015. Holmes testified that her 15-year-old daughter from a previous relationship had the upstairs northeast bedroom, where the police found the shotgun. Holmes denied knowing that there were drugs or a shotgun in the house.

¶ 16     Tiera Floyd testified for the defense. She had one prior conviction for "aggravated driving under the influence." Floyd testified that defendant was the twin brother of her boyfriend, Kevin Boose. According to Floyd, Thomas stayed at 1004 North Winnebago Street on a regular basis, including on February 13, 2015. Thomas showed Floyd a shotgun twice in the days before the police searched defendant's residence.

¶ 17     Defendant elected not to testify.

¶ 18     Finding that the testimony of Thomas, Holmes, and Floyd was not credible, the trial court found defendant guilty of being an armed habitual criminal and possession of cannabis with intent to deliver.

¶ 19               B. Second Amended Postconviction Petition

¶ 20     In his second amended postconviction petition, defendant maintained that other available witnesses could have supported his claim that he did not possess the shotgun. To that end, defendant alleged ineffective assistance of trial counsel for failing to call three witnesses: Sabastian Green (S.B.), Erica Holmes, and Mary Ann Suggs.

¶ 21     In his affidavit, defendant averred as follows. Before trial, he "gave information to [his] attorney to contact" Green, who would support defendant's argument that Green gave the shotgun to Thomas. Defendant "repeatedly asked [his] attorney to speak with Green and to have him testify at trial." Counsel told defendant that Green was "not needed[,] because Thomas would testify that the shotgun was his." Counsel added that defendant "had not paid him enough money to chase Green down." Defendant also asked his counsel to interview and call Erica Holmes and Suggs to testify. Their testimony "would have helped to establish that Thomas owned the shotgun and that he was not just visiting [defendant's] home on February 13, [2015], but in fact had been there for nearly a week and often stayed at [defendant's] home." Defendant

attested that he (1) did not receive the shotgun from Green, (2) did not know that Thomas brought the gun into defendant's home and hid it there, and (3) was "innocent of the offense for which [he] was convicted."

¶ 22        Green stated the following in his affidavit. He was known as "S.B." Before the police searched defendant's home, Green went to talk to defendant about a shotgun that Green did not want. Green spoke to defendant outside of defendant's house. Defendant made it clear to Green that "he had no use for the shotgun." However, defendant said that Thomas, who was in the house, may know someone who wanted the shotgun. Defendant went into the house. Minutes later, Thomas came out, looked at the shotgun, "and was excited about having it." Green handed the shotgun to Thomas. Thomas "put the shotgun in his pants leg, accepted the box of bullets[,] and went back into the house." Green indicated that he "was willing to come to Court to testify about all of this but was never contacted."

¶ 23        Erica Holmes asserted the following in her affidavit. In early February 2015, before the police searched defendant's home, she went there to visit her sister, Tamesa. Thomas also lived at this home, and he slept in the basement. Erica went into the basement to locate a coat. As she entered the basement, she saw Thomas "doing something with" a long gun. Erica expressed anger to Thomas about him having a weapon in the home, and she threatened to tell Tamesa if he did not get the weapon out of the home. Thomas exited the basement and told Erica that he would get the weapon out of the home after somebody picked him up. Although Erica recalled Thomas leaving the home that day, she did not see whether Thomas took the weapon with him. Erica never saw that weapon again. She told defendant before trial about what she knew, what she saw, and that she "would be willing to testify about these things." However, nobody contacted her.

¶ 24        Suggs stated as follows in her affidavit. On the evening of February 13, 2015, she arrived at defendant's home to give Thomas a ride. She noticed the police in and around the house. When Thomas came out of the home, he "made it absolutely clear that he was in a rush to leave." Suggs drove to her apartment with Thomas. Before entering her apartment, Thomas received a phone call, and he whispered to her that it was the police. Thomas hung up the phone, and he told Suggs that the police wanted him to return to defendant's home. Thomas was "frantic." He asked to use Suggs's phone because his phone had a low battery. Thomas stepped out of the car to talk. When Thomas got back in the car a few minutes later, he told Suggs that "they found his gun and that's why they wanted him to return to the home." Thomas assured Suggs that "unless they found his prints on the gun[,] they couldn't charge him because he's not on the lease of the home." "[A]bout 45 minutes after debating whether he should return," Thomas asked Suggs to drive him back to defendant's house. Suggs waited at defendant's house long enough to see Thomas being placed in a police car.

¶ 25                        C. The State's Motion to Dismiss

¶ 26        The State moved to dismiss defendant's second amended postconviction petition. The State contended that the decision not to present testimony from Green, Erica Holmes, and Suggs was trial strategy. The State noted that some of the facts in the new affidavits were matters that already came out at trial. The State posited that it would have been risky for the defense to call additional witnesses to corroborate favorable trial evidence, as doing so could create the risk that the witnesses might contradict themselves on the stand. Moreover, according to the State, Suggs's affidavit contained inadmissible hearsay and the information in Green's affidavit could have harmed the defense. Additionally, the State argued, defendant's postconviction argument rested on the faulty assumption that he could not have been convicted of being an armed habitual

criminal had the defense persuaded the trier of fact that Thomas owned the shotgun. To the contrary, the State maintained it was "entirely conceivable" that the trier of fact could have found that defendant and Thomas both constructively possessed the shotgun. The State asserted that defendant did not suffer prejudice from his counsel's failure to call the three specified witnesses, as it was speculative whether the trier of fact would have found those witnesses credible.

¶ 27 The court held a hearing with argument from counsel, then took the matter under advisement. On March 2, 2022, the court granted the State's motion to dismiss the second amended postconviction petition. Defendant filed an untimely notice of appeal. We initially dismissed the appeal for lack of jurisdiction. *People v. Boose*, No. 4-22-0283 (2022) (unpublished summary order under Illinois Supreme Court Rule 23(c)). Our supreme court entered a supervisory order directing us to vacate our judgment and treat defendant's notice of appeal as properly perfected. *People v. Boose*, No. 129195 (Ill. Dec. 23, 2022) (supervisory order).

¶ 28                                    II. ANALYSIS

¶ 29 Defendant argues that he made a substantial showing of ineffective assistance.

¶ 30 The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2020)) "provides a tool for criminal defendants to assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. House*, 2021 IL 125124, ¶ 15. There are three stages of postconviction proceedings. At the first stage, the court reviews the petition independently to "determine whether it is 'frivolous or *** patently without merit.' " *House*, 2021 IL 125124, ¶ 16 (quoting 725 ILCS 5/122-2.1(a)(2) (West 2008)). If the court does not summarily dismiss the petition, the matter proceeds to the second stage. *House*, 2021 IL 125124, ¶ 16. At the second stage, the court

may appear counsel for the petitioner, and the State may file a responsive pleading. *House*, 2021 IL 125124, ¶ 17. If the defendant does not make a substantial showing of a constitutional violation at the second stage, the court dismisses the petition. *House*, 2021 IL 125124, ¶ 17. However, if the defendant makes such a showing, the matter proceeds to a third-stage evidentiary hearing. *House*, 2021 IL 125124, ¶ 17.

¶ 31 In determining whether a defendant made a substantial showing of a constitutional violation at the second stage, the court must take as true all well-pleaded facts in the petition, unless such allegations are "affirmatively refuted by the record." *People v. Domagala*, 2013 IL 113688, ¶ 35. A court may not make credibility determinations until the third stage. *Domagala*, 2013 IL 113688, ¶ 35. We review *de novo* an order dismissing a petition at the second stage. *People v. Sanders*, 2016 IL 118123, ¶ 31.

¶ 32 Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Generally, to sustain a claim of ineffective assistance, a defendant must show that his counsel's performance was deficient and that such deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient where he or she made errors that were so serious that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A defendant establishes prejudice where "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. In that respect, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 33　　　　On appeal, defendant focuses on his counsel's failure to call Green and Suggs as witnesses; defendant seems to abandon his claim that counsel was ineffective for failing to call Erica Holmes. Defendant outlines how Green and Suggs could have supported the defense and why the result of the trial might have been different had they testified. Defendant contends it would be premature to consider the admissibility of Suggs's testimony about Thomas's out-of-court statements. The State's response largely echoes what it argued below in its motion to dismiss. We determine that defendant has not made a substantial showing that his counsel was ineffective for failing to call Green or Suggs as witnesses.

¶ 34　　　　In evaluating whether an attorney performed deficiently, "a court must indulge a strong presumption" that the attorney pursued a sound trial strategy. *Strickland*, 466 U.S. at 689. Courts are particularly deferential to attorneys when it comes to determining whether to call specific witnesses. To that end, "[d]ecisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel," and such matters are "generally immune from claims of ineffective assistance of counsel." *People v. West*, 187 Ill. 2d 418, 432 (1999). "The only exception to this rule is when counsel's chosen trial strategy is so unsound that 'counsel entirely fails to conduct any meaningful adversarial testing.' " *West*, 187 Ill. 2d at 432-33 (quoting *People v. Guest*, 166 Ill. 2d 381, 394 (1995)).

¶ 35　　　　We cannot say that defense counsel failed to conduct any meaningful adversarial testing. Counsel's strategy was to tie the shotgun found at 1004 North Winnebago Street to Thomas rather than defendant. In the State's case-in-chief, Thomas provided testimony favorable to the defense by claiming the shotgun was his and disavowing his prior statements to the police. Defense counsel then called Tamesa Holmes, who testified that Thomas lived at 1004 North Winnebago Street "off and on," including on February 13, 2015. Defense counsel also called

Floyd, who testified that Thomas stayed at 1004 North Winnebago Street regularly, including on February 13, 2015. According to Floyd, Thomas showed her a shotgun twice before February 13, 2015. Despite defense counsel's efforts to link the shotgun to Thomas, the trier of fact did not believe the testimony offered by Thomas, Tamesa Holmes, or Floyd.

¶ 36    Defendant now asserts that his counsel should have called two additional witnesses, Green and Suggs, to attempt to convince the trier of fact that the shotgun belonged to Thomas. In his affidavit, defendant attested that his counsel determined Green was "not needed" as a trial witness, as Thomas would claim ownership of the shotgun. Defendant did not explain in his affidavit why his counsel failed to call Suggs as a witness. Suggs did not specify in her affidavit whether defense counsel contacted her before trial.

¶ 37    Again, we must indulge the strong presumption that defense counsel pursued a sound trial strategy by determining which potential witnesses to present. *Strickland*, 466 U.S. at 689. Calling additional witnesses to try to tie the shotgun to Thomas could have been risky. With more witnesses would come more opportunities for the witnesses to contradict one another or to contradict what defendant told the police. One contradiction is obvious from the record. In his affidavit, Green stated that defendant was inside the house when Thomas accepted the shotgun from Green outside the house. However, defendant told the police that Thomas "took the gun and walked inside the house with it," suggesting that defendant saw Thomas accept the shotgun and take it inside. It would have been a reasonable strategy for defense counsel to avoid introducing testimony that contradicted defendant's own statement.

¶ 38    Defendant cites cases where courts remanded for third-stage evidentiary hearings to consider postconviction claims of ineffective assistance of counsel. The most relevant of these cases establish that a defense attorney may be ineffective for "failure to present exculpatory

evidence of which he is aware, including the failure to call witnesses whose testimony would support *an otherwise uncorroborated defense*." (Emphasis added.) *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999); see also *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 48 ("Mr. Willingham's trial counsel did not call witnesses who claim they would have supported Mr. Willingham's self-defense narrative, and the record does not reflect any rationale for this failure."); *People v. Johnson*, 2019 IL App (1st) 153204, ¶¶ 45-46 (noting that defense counsel cross-examined the State's witnesses but did not investigate a potential defense witness who would testify that defendant was not the shooter); *People v. Morris*, 335 Ill. App. 3d 70, 81 (2002) ("During trial, the only evidence offered by the defense was the defendant's own testimony as to his alibi."). However, none of the cases defendant cites involved claims akin to what he argues here: *i.e.*, that even though his counsel presented *some* witnesses to corroborate an available defense, and even though the trier of fact deemed those witnesses not credible, counsel should have called *more* witnesses. Defendant has not made a substantial showing that his counsel performed deficiently.

¶ 39 For similar reasons, defendant has not made a substantial showing that he was prejudiced by counsel's failure to call Green and Suggs as witnesses. Defendant's postconviction claim presumes the trier of fact would have credited the testimony of Thomas, Tamesa Holmes, and Floyd had Green and Suggs testified, too. We acknowledge that we cannot consider at this stage whether Green or Suggs would have been credible witnesses. However, the record does not give rise to a "reasonable probability" (*Strickland*, 466 U.S. at 694) that Green or Suggs would have compelled the trier of fact to evaluate the credibility of other witnesses differently.

¶ 40 Even if defendant could convince a trier of fact that Green gave the shotgun to Thomas, there is strong evidence in the record that defendant knew the shotgun was stored in his

house. Such evidence could support a finding that Thomas and defendant jointly possessed the shotgun. See *People v. Denton*, 264 Ill. App. 3d 793, 798 (1994) ("When two or more people share immediate and exclusive control or share the intention and power to exercise control, the result is not vindication of the defendant, but rather a situation of joint possession."). The evidence at trial showed that when officers arrived at 1004 N. Winnebago Street to execute a search warrant, nobody answered the door even though there were numerous people inside. When police officers forced their way inside, defendant told the officers that it was unnecessary to tear up the house, as they would only find "weed." Considering defendant admitted the officers would find weed, a reasonable inference is that defendant avoided answering the door and/or discouraged the police from searching the house because he knew they would find the shotgun. Furthermore, when a police officer found the shotgun, defendant immediately said it was Thomas's, which likewise suggests that defendant knew the shotgun was in the house. As mentioned above, defendant also gave a statement to the police suggesting that he saw Thomas walk inside defendant's home with the shotgun after meeting with Green. Accordingly, even if a trier of fact heard and believed the statements contained in Green's and Suggs's affidavits, there is still a strong basis in the record to conclude that defendant jointly possessed the shotgun with Thomas. In other words, showing that Thomas owned the shotgun would not necessarily defeat defendant's charge of being an armed habitual criminal.

¶ 41 Defendant must make a substantial showing that his constitutional rights were violated (*Domagala*, 2013 IL 113688, ¶ 33) by overcoming the strong presumption that his counsel pursued a sound trial strategy (*Strickland*, 466 U.S. at 689). Defendant has failed to meet that burden. Accordingly, the trial court properly granted the State's motion to dismiss defendant's second amended postconviction petition.

¶ 42                                     III. CONCLUSION

¶ 43            For the reasons stated, we affirm the trial court's judgment.

¶ 44            Affirmed.