2022 IL App (1st) 201046-U

No. 1-20-1046

Third Division
November 23, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
|  | ) |  |
| Plaintiff-Appellee, | ) |  |
|  | ) | No. 07 CR 19990 |
| v. | ) |  |
|  | ) | The Honorable |
| JASON MUNOZ, | ) | Charles P. Burns, |
|  | ) | Judge Presiding. |
| Defendant-Appellant. | ) |  |
|  | ) |  |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice McBride and Justice Gordon concurred in the judgment.

**ORDER**

¶ 1     *Held:* The second-stage dismissal of defendant's postconviction petition is affirmed, where (1) defendant is not entitled to further second-stage proceedings to develop an evidentiary record as to the effect of his drug and alcohol use on his brain development and (2) trial counsel was not ineffective in failing to present such evidence during defendant's sentencing hearing.

¶ 2     After a jury trial, defendant Jason Munoz (defendant) was convicted of first-degree murder and felony murder and was sentenced to 75 years in the Illinois Department of Corrections. Defendant's conviction was affirmed by this court on appeal. *People v. Munoz*, 2016 IL App (1st) 133646-U. Defendant subsequently retained private counsel and filed a postconviction

petition, alleging ineffective assistance of trial counsel and challenging his sentence as unconstitutional. The petition advanced to the second stage, where the State filed a motion to dismiss. The circuit court dismissed the petition and defendant now appeals, asking this court to remand for a third-stage evidentiary hearing on his ineffectiveness claim and for further second-stage proceedings on his constitutionality claim. For the reasons set forth below, we affirm.

¶ 3                                  BACKGROUND

¶ 4        A detailed recitation of the facts underlying defendant's conviction is contained in our earlier decision. See *Munoz*, 2016 IL App (1st) 133646-U, ¶¶ 4-53. We repeat here only those facts necessary to an understanding of the issues raised on this appeal.

¶ 5        Defendant, who was 26 years old at the time, was charged by indictment with eight counts of first-degree murder, including felony murder, and one count of attempted armed robbery in connection with the attempted robbery of Shane Hess (Hess) and the fatal shooting of Hess' friend Scott Christopher Himle (Himle) in the early morning hours of August 31, 2007. At approximately 11:35 a.m. on that date, defendant was arrested and transported to Area 5 police headquarters for questioning, where he was placed in an interview room with the electronic recording system activated. During his time in custody, defendant made a statement implicating himself in the shooting.

¶ 6                              *Pretrial Proceedings*

¶ 7        Prior to trial, defense counsel filed a motion to suppress any statements that defendant had made while in custody, claiming, in relevant part, that defendant was visibly under the influence of drugs at the time he was at the police station and that defendant was not initially

offered medical care despite the fact that "it was apparent that [d]efendant was seriously ill either from withdrawal or from related medical issues."

¶ 8    During the hearing on the motion to suppress, the detectives who had investigated the shooting testified, and portions of the electronic recording from the interview room were played for the circuit court throughout the testimony. Detective Arthur Young (Young) testified that he interviewed defendant from 1:25 p.m. to 1:31 p.m., and defendant did not appear to be physically or mentally ill at that time. Young conducted another interview with defendant at approximately 4:44 p.m., and defendant did not complain of any illness or appear to be "dopesick," *i.e.*, ill due to drug withdrawal. Young interviewed defendant again from approximately 8:06 p.m. until 9:02 p.m., and defendant neither exhibited signs of illness nor indicated that he was ill. Defendant became ill and was taken to the hospital for approximately one hour at 10:41 p.m., when Young was not present. Young next interviewed defendant from 1:27 a.m. to 1:58 a.m., during which Young asked defendant whether he was becoming dopesick and defendant responded that he was not. Defendant instead told Young that he was "hung over" and admitted to occasionally using crack and heroin.

¶ 9    Detective Edward Schak (Schak) testified that he participated in several interviews of defendant along with Young on August 31 and September 1, 2007. During an interview with defendant on September 1, 2007, defendant made several statements implicating himself in the shooting. Schak testified that defendant did not appear to be dopesick or otherwise physically or mentally ill while making these statements. On cross-examination, Schak testified that defendant had informed him he frequently used cocaine and had previously been a heroin user.

¶ 10    Detective David Healy (Healy) testified that he interviewed defendant at approximately 4:06 p.m. on September 1, 2007, where defendant described prior crimes he had committed

and described the handgun used in the shooting. Healy testified that defendant never indicated that he was dopesick or otherwise did not feel well during that conversation. Healy further testified that at approximately 7:25 p.m., defendant asked for his medication and Healy called for an ambulance to transport defendant to the hospital so he could receive his medication.

¶ 11     Defendant did not testify during the hearing, and during arguments, counsel asserted that defendant's rights were violated given, among other things, the length of his time in custody, his drinking and drug use prior to his arrest, and his physical condition, including lack of sleep. The circuit court ultimately denied the motion to suppress.

¶ 12                                    *Trial*

¶ 13     The evidence presented at trial established that, at approximately 3 a.m. on August 31, 2007, Hess, Himle, and Himle's girlfriend, Michelle Parisi (Parisi), were riding their bicycles home after attending a party. The three traveled down Maplewood Avenue, with Himle and Parisi in front and Hess riding behind them. As they rode, Parisi heard someone running, and when she looked over her shoulder, she observed someone running next to Hess' bicycle. Hess testified that he felt a hand grab his backpack and he was pulled off his bicycle and landed in the middle of the street. Hess felt a hand on his backpack, preventing him from rising, and heard the man holding the backpack instruct him to "give me everything in your wallet, and everything will be okay." Hess, however, did not reach for his wallet. After the man released his backpack, Hess rose and ran between two parked vehicles. As he reached the sidewalk, he turned and observed Himle and a man in the middle of the street. The man was approximately 5 to 10 feet from Himle and was pointing a handgun at him; other than Parisi, Hess did not observe anyone else standing nearby. Hess witnessed a flash as the weapon was fired, although

he did not observe Himle being shot. Parisi similarly testified that she observed the man holding his arm straight out with a flat black metal handgun in his hand and firing once.

¶ 14   Several of the State's other witnesses testified to defendant's conduct immediately prior to the shooting. Lori Karra (Karra) testified that she was sitting with a friend on a stoop on North Avenue east of Maplewood Avenue between 2 a.m. and 3 a.m. on August 31, 2007, when a friend nicknamed "Ice" approached her. Ice was accompanied by defendant, and Karra heard one of them mention an intention to rob people. Karra also observed defendant with a handgun tucked into the waistband of his pants. Ice, whose name was Donald Mercado (Mercado), testified that defendant had approached him on the evening of August 31, 2007, attempting to sell a handgun. Mercado did not purchase the weapon, but instead unsuccessfully tried to take the weapon from defendant so that he could purchase drugs. Mercado then agreed to assist defendant in selling the handgun, and escorted defendant to a group of gang members who were ultimately uninterested in purchasing the weapon. Mercado and defendant then observed "three or four white people" riding by on bicycles, and defendant ran after them. Mercado heard a gunshot but did not observe the shooting.

¶ 15   In grand jury testimony which he denied making, Brandon Smith (Smith) testified that on August 31, 2007, he was with his cousin Diamond Davis (Davis) on Maplewood Avenue and LeMoyne Street. They were speaking with Mercado when defendant rode up on a bicycle, retrieved a handgun from his waistband, and showed it to Smith. Mercado attempted to convince Smith and Davis to purchase the handgun, but they were uninterested. Five or ten minutes into the conversation, three or four people on bicycles rode down Maplewood Avenue. Defendant stated that he was going to rob one of them, and ran after them. Defendant grabbed

one by the bookbag and pulled him off the bicycle. Smith then heard a gunshot. Davis also testified to a substantively similar account.

¶ 16     In his defense, defendant did not deny the shooting. Instead, he testified that he had arrived at a friend's house shortly after noon that day and began drinking alcohol. At the time, defendant drank at least one case of beer daily; he also used cocaine every other day and marijuana less frequently. Defendant and his friend later attended a party at defendant's brother's house, where defendant drank more alcohol. After being at the party for two hours, they returned to the friend's residence, where defendant continued drinking alcohol and used cocaine at 1 a.m. Defendant asked his friend for more cocaine, and when the friend denied having any more cocaine, convinced him to give defendant a handgun to sell. When defendant left to sell the handgun, he ran into Mercado. When he showed Mercado the handgun, Mercado "ma[de] a big scene and he sa[id] we're going to rob everybody out here." Defendant explained that he wished to sell the handgun, not rob anybody. After unsuccessfully searching for buyers, defendant and Mercado encountered Smith and Davis. While they were speaking, defendant noticed that the three were gradually encircling him, and realized that he was being "set up" so they could take the handgun and likely use it against him.

¶ 17     As the bicyclists passed, defendant felt Mercado tug at his sweatshirt, indicating that they should rob the riders. Mercado and defendant headed toward the street; defendant followed Mercado in order to extricate himself from the situation. Defendant ran after the bicyclists and pulled one off his bicycle. Another of the bicyclists jumped off his bicycle and began walking toward defendant. Defendant displayed his handgun to deter him from approaching, repeatedly telling him to stop walking. Defendant believed that the bicyclist whom he had pulled from the

bicycle was still present and that Mercado was likely with him. Defendant panicked, believing he was going to be attacked, and "got jumpy and fired a shot."

¶ 18     After jury deliberations, defendant was convicted of first-degree murder, including felony murder. Defendant filed a motion to reconsider asking the circuit court to enter a finding of not guilty or, in the alternative, to find him guilty of involuntary manslaughter or grant him a new trial. The circuit court denied the motion and the matter proceeded to sentencing.

¶ 19     *Sentencing*

¶ 20     Defendant's presentence investigation report (PSI) indicated that defendant reported that he began drinking alcohol on a regular basis when he was 17 years old, and that prior to his arrest in the instant case, he was normally consuming a 12-pack of beer on a daily basis. Defendant further reported that, on the day of his arrest, he could not recall the amount of beer he had consumed, but he was intoxicated. With respect to drugs, defendant reported that he had been smoking marijuana several times a month since the age of 17 and experimented with heroin "a few times" between the ages of 18 and 19. Except when incarcerated, defendant reported that he had been using cocaine three to four times a week since the age of 18 and spent $200 per week on cocaine. Defendant further reported that he was under the influence of cocaine at the time of the offense.

¶ 21     During the sentencing hearing, defense counsel argued in mitigation that defendant's PSI, and his testimony at trial, demonstrated that defendant "was an alcoholic and a drug addict and an extreme one at that." Counsel argued that all of defendant's prior criminal history, including the instant offense, were related to his drug and alcohol use. Counsel noted that defendant was drinking alcohol and using narcotics "on a daily basis in vast amounts," and argued that "that's how this whole situation snowballed out of control." Counsel argued that defendant was not

planning on killing anyone but was simply "someone who was clearly intoxicated out there looking to try to get high." Counsel asked the circuit court to consider defendant's history of drug and alcohol use, along with letters submitted by defendant's family and friends and defendant's trial testimony, and sentence defendant to the low end of the sentencing range.

¶ 22 In sentencing defendant, the circuit court indicated that it had considered all of the evidence in the case, as well as the factors in aggravation and mitigation. The circuit court stated that it found defense counsel's arguments as to defendant's history of drug and alcohol use unconvincing, finding that "clearly based on the presentence investigation, you have the capacity and the ability and the upbringing to conform your conduct," but chose not to do so. The circuit court found that "I disagree so strongly with [defense counsel] because I don't blame the alcohol and the drugs. I blame you because you are the one who was willing to use deadly violence, deadly force in this case[,] murder of an innocent person, to get what you want."

¶ 23 The circuit court noted that the sentencing range for first-degree murder was 20 to 60 years, and that the jury found that defendant had personally discharged a firearm which proximately caused death to another person, which carried an enhancement of 25 years to life. The circuit court sentenced defendant to 50 years for first-degree murder, plus a 25-year enhancement, for a total of 75 years in the Illinois Department of Corrections, along with three years of mandatory supervised release.

¶ 24 Defendant filed a motion to reconsider sentence, again raising the issue of his drug and alcohol dependence, which was denied by the circuit court.

¶ 25                              *Postconviction Proceedings*

¶ 26          In 2017, defendant, through counsel, filed a postconviction petition, alleging (1) ineffective assistance of trial counsel at the suppression hearing, (2) "recent developments in the science of brain development and its impact on decision-making and sentencing considerations," and (3) ineffective assistance of trial counsel during defendant's trial. As is relevant to the instant appeal, defendant alleged that the circuit court should have considered his lengthy history of drug abuse, and the likely effect that abuse had on his brain development and functioning, both at the suppression hearing and at sentencing. Defendant cited a 2009 study which demonstrated that "[t]he effect of protracted drug and alcohol use on the developing brain has been well documented." Defendant also cited *People v. Harris*, 2016 IL App (1st) 141744, in which the appellate court found that the circuit court erred in failing to consider the defendant's youth and limited brain development when it sentenced him to what would amount to a life sentence. Defendant argued that, based on the current understanding of the effects of drug and alcohol abuse on the developing brain, "there is no question" that defendant's cognitive functioning was impaired by his use of drugs and alcohol. Defendant accordingly claimed that the circuit court should have considered this abuse both in determining whether his statement to detectives was voluntary and in sentencing him to 75 years.

¶ 27          Attached to the petition, among other things, was defendant's affidavit, in which he averred that in August 2007, he was drinking alcohol daily and "would drink from the time I woke up until I fell asleep." He was using cocaine regularly, and also occasionally ingested his girlfriend's Seroquel, as well as Rohypnol. Defendant averred that at the time of his arrest, he was intoxicated and was ill from alcohol and cocaine withdrawal while he was in custody.

¶ 28  The petition was docketed and advanced to the second stage, and the State subsequently filed a motion to dismiss. With respect to defendant's argument about his youth and brain development, the State noted that defendant was 26 years old at the time of the shooting, not a juvenile, and significantly older than defendants in other cases in which age was a consideration.

¶ 29  On August 24, 2020, the circuit court entered an order dismissing defendant's postconviction petition. With respect to the claims concerning defendant's drug and alcohol use, the circuit court found that defense counsel raised the issue at the sentencing hearing, and that the sentencing court did take defendant's history into account. The circuit court noted that defendant cited an article discussing the impact of alcohol and drugs on youth, but did not attach any affidavits from psychiatrists or psychologists to explain how the drugs and alcohol affected defendant mentally. The circuit court found that while defendant had attached numerous documents to his petition, "none of them supports any of the contentions contained herein." Finally, the circuit court found that *Harris* did not apply to the instant case, as defendant was not a juvenile.

¶ 30  Defendant timely filed a notice of appeal, and this appeal follows.

¶ 31        ANALYSIS

¶ 32  On appeal, defendant raises two related issues: (1) whether his sentence was unconstitutional due to the effect of his drug and alcohol abuse on his development and (2) whether trial counsel was ineffective in failing to present evidence of defendant's drug and alcohol addiction as mitigating evidence during his sentencing hearing.

¶ 33                                    *Post-Conviction Hearing Act*

¶ 34          The Post-Conviction Hearing Act (Act) provides a framework for incarcerated individuals to collaterally attack their convictions by establishing the substantial denial of a constitutional right during trial or sentencing. 725 ILCS 5/122-1(a)(1) (West 2018). Claims are limited to those that were not and could not have been previously litigated. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). Proceedings under the Act occur in three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the first stage, the circuit court determines whether a petition is frivolous or patently without merit. *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2018). At the second stage, the court may appoint counsel to represent an indigent defendant and, if necessary, to file an amended petition; at this stage, the State must either move to dismiss or answer the petition. *Gaultney*, 174 Ill. 2d at 418; 725 ILCS 5/122-4, 122-5 (West 2018). Only if the petition and accompanying documentation make a substantial showing of a constitutional violation will the defendant proceed to the third stage, an evidentiary hearing on the merits. *People v. Silagy*, 116 Ill. 2d 357, 365 (1987); 725 ILCS 5/122-6 (West 2018).

¶ 35          In the instant case, defendant's petition was dismissed at the second stage, so we must determine whether defendant's petition made a substantial showing of a constitutional violation. To make a substantial showing, a defendant must demonstrate that his well-pled allegations, if established at the evidentiary hearing, would entitle him to relief. *People v. Domagala*, 2013 IL 113688, ¶ 35. The dismissal of a postconviction petition without an evidentiary hearing is reviewed *de novo*. *Cotto*, 2016 IL 119006, ¶ 24. *De novo* consideration means that the reviewing court performs the same analysis the circuit court would perform and owes no deference to the lower court's judgment or reasoning. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 34.

¶ 36                                    *Constitutionality of Sentence*

¶ 37        Defendant first claims that his long-term drug and alcohol abuse meant that his 75-year sentence violated the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Specifically, defendant claims that, while he was 26 years old at the time of the offense, his drug and alcohol abuse "render his circumstances analogous to that of an adolescent" and a *de facto* life sentence was therefore unconstitutional as the circuit court did not consider his youth and limited brain development in sentencing him. Defendant, however, does not ask us to opine on the merits of this claim but instead asks us to remand the cause for further second-stage proceedings in order to permit him to develop the record as to this claim. Defendant's request is based on the approach taken in *People v. House*, 2021 IL 125124, in which our supreme court remanded for further second-stage proceedings where it found that the record was not sufficiently developed to permit consideration of the defendant's claim as to his sentence. In defendant's case, however, we cannot find that he is entitled to further second-stage proceedings on his sentencing claim.

¶ 38        Defendant's constitutional challenge stems from a line of cases from the United States Supreme Court providing heightened protections for juvenile defendants in sentencing under the eighth amendment of the United States Constitution. U.S. Const., amend. VIII. The Supreme Court has held that the eighth amendment prohibits capital sentences for juveniles who commit murder (*Roper v. Simmons*, 543 U.S. 551, 578-79 (2005)), mandatory life sentences without the possibility of parole for juveniles who commit nonhomicide offenses (*Graham v. Florida*, 560 U.S. 48, 82 (2010)), and mandatory life sentences without the possibility of parole for juveniles who commit murder (*Miller v. Alabama*, 567 U.S. 460, 489 (2012)). These cases reflect society's evolving recognition that "children are constitutionally

different from adults for purposes of sentencing." *Id.* at 471. Following *Miller*, courts must consider juveniles' youth and attendant characteristics before sentencing them to life without parole. *Id.* at 483. These protections, however, apply only to juveniles, and our supreme court has recognized that the United States Supreme Court "has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *People v. Harris*, 2018 IL 121932, ¶ 58.

¶ 39    The proportionate-penalties clause of the Illinois Constitution, however, provides broader protection than the eighth amendment. See *People v. Clemons*, 2012 IL 107821, ¶ 40 (the proportionate-penalties clause "is not synonymous with" the eight amendment). Our supreme court has thus acknowledged that young adult offenders are not foreclosed from raising challenges under the proportionate-penalties clause based on the evolving science of juvenile maturity and brain development. See *House*, 2021 IL 125124, ¶¶ 31-32 (19-year-old defendant); *People v. Harris*, 2018 IL 121932, ¶¶ 46, 48 (19-year-old defendant); *People v. Thompson*, 2015 IL 118151, ¶ 44 (18-year-old defendant). Our supreme court has further noted that, since an as-applied constitutional challenge is dependent on the particular facts and circumstances of the individual defendant, "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Thompson*, 2015 IL 118151, ¶ 37. Such a challenge is appropriately raised in a postconviction proceeding, where an appropriate record may be developed. See *Harris*, 2018 IL 121932, ¶ 48 (the Act specifically allows for raising constitutional questions "which, by their nature, depend[ ] upon facts not found in the record" (internal quotation marks omitted)).

¶ 40    In *House*, our supreme court remanded for further second-stage proceedings in order to develop such a record. In that case, the 19-year-old defendant was sentenced to two consecutive

life sentences for murder, as well as two consecutive 30-year sentences for aggravated kidnapping. *People v. House*, 2019 IL App (1st) 110580-B, ¶ 4, *rev'd*, *House*, 2021 IL 125124. The defendant filed both a direct appeal and a postconviction petition; in the postconviction petition, the defendant alleged that his life sentence violated the proportionate-penalties clause. *House*, 2021 IL 125124, ¶ 7. The circuit court dismissed the postconviction petition at the second stage, and the appellate court reversed, finding that the mandatory life sentence violated the proportionate-penalties clause, and remanded for resentencing. *Id.* ¶ 9. The supreme court entered a supervisory order, directing the appellate court to consider the effect of the then-recently issued opinion in *Harris*. *Id.* ¶ 11. On remand, the appellate court again found that the mandatory life sentence violated the proportionate-penalties clause and remanded for resentencing. *Id.* ¶ 12.

¶ 41       In reviewing the appellate court's decision, our supreme court noted that the parties had requested a remand for further second-stage proceedings to "develop and present evidence to the trial court, with assistance of counsel, demonstrating how the evolving science on juvenile maturity and brain development applies to an emerging adult and to the petitioner's specific circumstances." *Id.* ¶ 22. The appellate court, however, determined that no further record development was necessary in order to find the sentence unconstitutional. *Id.* ¶ 23. Our supreme court disagreed, finding that further development of the record was necessary, as the defendant "did not provide or cite any evidence relating to how the evolving science on juvenile maturity and brain development applies to his specific facts and circumstances." *Id.* ¶ 29. The supreme court further noted that "no trial court has made factual findings concerning the scientific research cited in the articles [relied on by the appellate court], the limits of that research, or the competing scientific research, let alone how that research applies to petitioner's

14

characteristics and circumstances." *Id.* Our supreme court accordingly remanded the cause to the circuit court for further second-stage proceedings. *Id.* ¶ 32.

¶ 42     We cannot find that *House* requires a similar result in the instant case. We first note that defendant is different than the *House* defendant in his level of culpability; defendant was admittedly the shooter, while the defendant in *House* was not involved in the killings at issue in that case. See *id.* ¶ 5. Additionally, defendant was 26 years old at the time of the offense, substantially older than the defendants in any cases on which he relies. Defendant has not cited a single case in which a court has extended the analysis of a defendant's "juvenile characteristics" so far beyond age 18. The closest cases defendant cites are *People v. Savage*, 2020 IL App (1st) 173135, which involved a 22-year-old defendant, and *People v. Clark*, 2021 IL App (3d) 180610, *appeal allowed*, No. 127273, which involved a 24-year-old defendant. Defendant is several years older than either defendant, however, and both cases are significantly different factually. *Savage* involved first-stage proceedings for a defendant who had been using drugs since age 9 and was therefore allegedly more susceptible to peer pressure. *Savage*, 2020 IL App (1st) 173135, ¶ 7. *Clark* involved a motion for leave to file a successive postconviction petition by an intellectually disabled and mentally ill defendant, and the circuit court's denial of the motion was affirmed in a split decision. *Clark*, 2021 IL App (3d) 180610, ¶ 1. Accordingly, neither case supports defendant's claim here.

¶ 43     Furthermore, the opportunity defendant seeks—remand to develop the record—is an opportunity that was present prior to the time his petition was dismissed. Indeed, in his postconviction petition, defendant cited the appellate court decision in *Harris* and a 2009 study concerning the effect of drug and alcohol abuse on brain development. Prior to the filing of the State's motion to dismiss, moreover, the supreme court decision in *Harris* was issued—which

expressly noted that a developed evidentiary record was necessary to resolve a similar proportionate-penalties clause challenge. See *Harris*, 2018 IL 121932, ¶ 48. Defendant, however, never sought to amend his petition to supplement the record, nor did he request the opportunity to develop the record below. We do not read *House* as requiring the appellate court to allow a defendant endless opportunities to develop the record when the necessity of such a record was clear while the postconviction proceedings were ongoing in the circuit court. Accordingly, we cannot find that defendant is entitled to further second-stage proceedings and affirm the circuit court's second-stage dismissal of his constitutional claim.

¶ 44                                  *Ineffective Assistance of Counsel*

¶ 45        Defendant also contends that the circuit court erred in dismissing his claim that trial counsel was ineffective in failing to properly present his history of substance abuse during sentencing. In order to determine whether a defendant was denied his right to effective assistance of counsel, we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that "counsel's representation fell below and objective standard of reasonableness" and that he was prejudiced such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; see also *People v. Briones*, 352 Ill. App. 3d 913, 917 (2004).

¶ 46        In this case, defendant claims that trial counsel did not properly present his history of substance abuse at sentencing. Defendant acknowledges that evidence of a defendant's substance abuse may be a "double-edged sword" at sentencing which may be considered as either mitigating or aggravating evidence. See *People v. Mertz*, 218 Ill. 2d 1, 83 (2005).

16

Defendant further acknowledges that trial counsel did, in fact, "emphasize[ ] [defendant's] history of serious abuse of alcohol and cocaine at his sentencing hearing." Defendant, however, contends that trial counsel "failed to offer the additional facts that would imbue that history with a compelling mitigative force." Specifically, defendant claims that trial counsel should have presented evidence of the impact of his substance abuse on his brain development. We do not find this argument persuasive.

¶ 47     Defendant cites *People v. King*, 192 Ill. 2d 189 (2000), as an example of a case in which a defendant made a substantial showing that defense counsel was ineffective for failing to flesh out a sentencing argument based on the defendant's childhood and upbringing. In *King*, which was a capital case, defense counsel argued that the defendant's troubled background served as a mitigating circumstance. *Id.* at 200. In support of this argument, however, counsel presented only two witnesses, both of whom provided brief testimony that described the defendant's childhood "in general terms." *Id.* at 199. In his postconviction petition, the defendant alleged that counsel was ineffective for failing to investigate and present additional mitigation evidence, including witnesses who averred that defense counsel never contacted them. *Id.* at 200-01. Our supreme court noted that evidence of a difficult childhood or a defendant's history of drug and alcohol abuse were not inherently mitigating, and counsel was not automatically ineffective for failing to present evidence of that nature. *Id.* at 201. In the case before it, however, defense counsel chose to present such evidence, but neglected "to investigate and present evidence that would have added substance to that argument and would have provided greater detail about the defendant's childhood and upbringing." *Id.* Instead, "[t]he evidence presented by counsel showed only the broad outlines of this theory of mitigation, and counsel apparently presented only a small amount of the available evidence in support of this

17

contention." *Id.* Our supreme court accordingly found that an evidentiary hearing was required on the issue. *Id.*

¶ 48     We cannot find that *King* bears any resemblance to the situation present here. First, as noted, *King* was a capital case, which involves different considerations from noncapital cases. See, *e.g.*, *People v. Holman*, 103 Ill. 2d 133, 177 (1984) (noting that, due to the qualitative difference between death and other forms of punishment, our supreme court has elected to address errors in death penalty cases which might have affected the decision of the sentencing jury even where they otherwise would have been forfeited). More importantly, the record in the case at bar shows that the circuit court was presented with more than "the broad outlines" (*King*, 192 Ill. 2d at 201) of defense counsel's theory of mitigation. Throughout the trial, and through sentencing, defense counsel highlighted defendant's drug and alcohol use, and evidence of it was before the circuit court throughout the entirety of the trial and sentencing, including in (1) the video from defendant's interrogation, (2) the testimony of trial witnesses, including defendant, (3) the PSI, and (4) defense counsel's arguments in opening, closing, and at sentencing. There appears to be no doubt that the circuit court accepted the fact that defendant used drugs and alcohol, and had been doing so for some time, as the circuit court expressly noted during sentencing that the PSI "confirm[ed]" defense counsel's claims about defendant's heavy drug and alcohol use.

¶ 49     The only substantive evidence raised by defendant that was not already before the circuit court at the time of its sentencing decision was the 2009 study cited in the postconviction petition. There is no indication in the record as to whether defense counsel was aware of this study (or others like it) or investigated the possibility of using such studies as mitigating evidence, other than defendant's statement in his affidavit that "[t]o the best of my knowledge,

[defense counsel] did not do any research or present any argument about the impact of my extensive drug abuse on my brain." To the extent that defense counsel was aware of it, counsel could reasonably have concluded that this was not a fruitful avenue to highlight, as defendant's regular drug and alcohol abuse reportedly began at age 17, not when he was a child or young teen;[1] defendant's PSI did not indicate any physical or psychological problems stemming from his drug or alcohol use; and defendant's PSI and testimony demonstrated his intelligence.

¶ 50   Due to the nature of evidence of substance abuse, defense counsel must make a strategic decision on whether to present such evidence. *People v. Ward*, 187 Ill. 2d 249, 261 (1999). "Simply because the defendant views his substance abuse history as mitigating does not require the sentencer to do so." *Mertz*, 218 Ill. 2d at 83. "Decisions on what evidence to present and which witness to call on a defendant's behalf rest with trial counsel and, as matters of trial strategy, are generally immune from claims of ineffective assistance of counsel." *Ward*, 187 Ill. 2d at 261. Here, counsel's decision on the type and amount of evidence to present was a matter of trial strategy and does not support a finding of ineffective assistance of counsel.

¶ 51   Moreover, even if defense counsel was unaware of the existence of the 2009 study or others like it, there is no indication that further focus on the impact of defendant's substance abuse on his development would have had any effect on the circuit court's sentencing decision. Defendant contends that even one additional day of imprisonment constitutes prejudice, relying on *Glover v. United States*, 531 U.S. 198 (2001). In *Glover*, the United States Supreme

---

[1] We note that defendant's postconviction petition alleges that "[i]t is undisputed that [defendant] had been using drugs and alcohol since his early teenage years." Defendant's affidavit, however, does not indicate when he began using drugs and alcohol, and his PSI provides that he reported drinking alcohol and using marijuana beginning at age 17. "Well-pleaded factual allegations of a postconviction petition and its supporting evidence must be taken as true unless they are positively rebutted by the record of the original trial proceedings." *People v. Sanders*, 2016 IL 118123, ¶ 48. As the petition's allegations are positively rebutted by the record of the original trial proceedings, we consider defendant's substance abuse to have begun at age 17, not in his "early teenage years."

Court suggested that "any amount of actual jail time has Sixth Amendment significance," and an error in a sentencing calculation may constitute prejudice for purpose of an ineffective assistance of counsel claim. *Id.* at 203-04. The *Glover* Court also expressly noted, however, that the case before it was "not a case where trial strategies, in retrospect, might be criticized for leading to a harsher sentence." *Id.* at 204. Instead, the *Glover* defendant's sentence fell outside the sentencing guidelines that he contended should have been applied. See *Glover*, 531 U.S. at 202. This is not such a case. In the type of case present in *Glover*, if the defendant was correct, prejudice necessarily follows, as the defendant's sentence was undisputedly longer than permitted. Here, by contrast, both the sentence imposed by the circuit court and the sentence sought by defendant fall within the applicable sentencing range, meaning that defendant must make a showing that there is a reasonable probability that his sentence would have been decreased if trial counsel had presented additional evidence of defendant's substance abuse and the scientific studies concerning his development.

¶ 52 First, to the extent that defendant argues that defense counsel should have presented the scientific studies, such studies would have been of limited use unless counsel also presented the testimony of psychologists or other experts to opine that defendant's development was, in fact, affected by his drug and alcohol use. Without such evidence, a connection between the studies and defendant is purely speculative. See *Harris*, 2018 IL 121932, ¶ 46 (finding that the defendant's constitutional challenge to his sentence was premature where the record did not contain evidence about how the evolving science on juvenile maturity and brain development applied to the defendant's specific facts and circumstances).

¶ 53 Additionally, as noted, there were several factors suggesting that a focus on the long-term effect of defendant's substance abuse may not have proven persuasive. Defendant's regular

20

drug and alcohol abuse reportedly began at age 17, not when he was a child or young teen. Defendant was also 26 years old at the time of the offense, not 18 or even 21, meaning that the circuit court would have needed to find that the substance abuse of a fully-grown adult would have affected his development in such a way as to make him less culpable. Defendant's PSI did not indicate any physical or psychological problems stemming from his drug or alcohol use, however, and defendant's PSI and testimony demonstrated his intelligence.

¶ 54　　　Furthermore, while trial counsel did not present scientific evidence, counsel did argue that drug and alcohol use were the underlying cause of defendant's actions, including his prior criminal history. The circuit court, however, found such an argument unpersuasive, finding that "clearly based on the presentence investigation, you have the capacity and the ability and the upbringing to conform your conduct," but chose not to do so. We therefore cannot find that defendant was prejudiced in any way by counsel's conduct. Accordingly, we find that the circuit court properly dismissed defendant's ineffective assistance of counsel claim at the second stage.

¶ 55　　　　　　　　　　　　　　　　CONCLUSION

¶ 56　　　For the reasons set forth above, we find that the circuit court properly dismissed defendant's postconviction petition at the second stage.

¶ 57　　　Affirmed.